# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

SERTA SIMMONS BEDDING, LLC and
DREAMWELL, LTD.,

               Plaintiffs,

   v.

CASPER SLEEP INC.,

               Defendant.

Civil Action No. 17-cv-7468-AKH

---

## DECLARATION OF BERNHARD KUCHEL IN SUPPORT OF DEFENDANT CASPER SLEEP INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

---

**TABLE OF CONTENTS**

<u>Page</u>

I.     INTRODUCTION ............................................................................................ 1

II.    MATERIALS CONSIDERED ....................................................................... 1

III.   LEGAL STANDARDS ................................................................................. 1

IV.   OPINIONS REGARDING THE CLIFT DECLARATION SUBMITTED WITH PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF ................................. 3

    A.    "body" ['763, cl. 1, 8 & 9; '173, cls. 5 & 6; '935, cl. 10] ...................................... 3

    B.    "at least one of the top and bottom surfaces including a plurality of channels" ['763, cl. 1] ........................................................................................ 11

    C.    Whether Dreamwell disclaimed channels that are centrally disposed in the interior of the mattress, and not on the top or bottom surface of the mattress ........................................................................................................ 14

    D.    "channel" ['763, cls. 1, 4, 7, 8, 9, 10 & 12; '173, cls. 5 & 6; '935, cls. 10 & 13] ................................................................................................................. 15

    E.    "within" ['763, cls. 1 & 4; '173, cl. 5] .................................................................. 18

    F.    "does not entirely fill the channel" ['935, cl. 10] ................................................ 19

    G.    Whether Dreamwell disclaimed inserts that fill the channel to the surface .......... 23

    H.    "assembling the [plurality of] rectangular foam pieces to form the body having a channel in the region" ['763, cl. 8; '935, cl. 10] ..................................... 25

    I.    Whether Dreamwell disclaimed forming a channel by cutting into a layer of foam and then assembling the cut layer with another layer of foam ................ 30

    J.    Order of steps for method claims ['763, cl. 8; '173, cl. 5; '935, cl. 10] ............... 32

i

I, Bernhard Kuchel, hereby declare under penalty of perjury:

## I.     INTRODUCTION

1.      I have been retained by Defendant Casper Sleep Inc. to provide my opinions regarding U.S. Patent Nos. 7,424,763 ("the '763 patent"); 7,036,173 ("the '173 patent"); and 8,918,935 ("the '935 patent").  Specifically, I have been asked to provide my opinions regarding the declaration of Mr. Matthew Clift submitted by the Plaintiffs with their opening claim construction brief.  I have personal knowledge of the facts and opinions set forth in this declaration and, if called upon to do so, I would testify competently thereto.

2.      I previously submitted a declaration in this case in support of Defendant Casper Sleep Inc.'s Opposition to Plaintiffs' Motion for Preliminary Injunction, and I was deposed on November 22, 2017.  My prior declaration included a section on my qualifications and experience, as well as a copy of my curriculum vitae, which I incorporate herein by reference.

3.      Should I testify at any hearing or trial, I may rely on demonstratives or other visual aids such as computer graphics, videos, screenshots, and other presentation materials regarding the Asserted Patents and the technology described therein.

## II.     MATERIALS CONSIDERED

4.      In addition to my experience in this field, the materials that I considered in forming the opinions in this declaration include all references cited as well as the list of materials attached as Appendix A.  I reserve the right to modify or supplement my opinions, as well as the basis for my opinions, as I have the opportunity to review and consider additional information.

## III.    LEGAL STANDARDS

5.      I understand that claim terms should generally be given their ordinary and customary meaning.  I understand that the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art at the time of the invention.

6.      I understand that, to properly understand the meaning of claim terms, one should first consider the intrinsic evidence, which includes the claim language itself, the patent specification, and the patent's prosecution history.  For example, the patent specification may show that the inventor used words or terms in a manner inconsistent with their plain and ordinary meaning.  Specifically, I understand that where the specification reveals a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess, the inventor's lexicography governs.

7.      I understand that the prosecution history of the patent may also provide guidance in construing a claim term.  For example, the prosecution history may show that the patent applicant might have limited the scope of some or all of the claims during prosecution, either affirmatively or by implication.  I understand that when a patentee makes clear and unequivocal statements before the Patent Office to distinguish prior art from the claim, those statements are binding and preclude a broader construction.  I further understand that even where a statement made during prosecution does not rise to the level of a binding disclaimer of claim scope, that statement may still provide intrinsic record support that favors a narrower construction.

8.      I understand that extrinsic evidence, such as dictionary definitions, textbooks, and primary literature in the prior art can shed useful light on the relevant art, but are less significant than the intrinsic record in determining the legally operative meaning of claim language.  I understand that extrinsic evidence may not be used to vary, contradict, expand, or limit the claim language from how it is defined in the specification or prosecution history.

## IV. OPINIONS REGARDING THE CLIFT DECLARATION SUBMITTED WITH PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF

### A. "body" ['763, cl. 1, 8 & 9; '173, cls. 5 & 6; '935, cl. 10]

| SSB Proposed Construction/Position: | Casper Proposed Construction/Position: |
|---|---|
| "a mass" | "the main physical structure of the mattress, not any layer(s) thereof" |

9. It is my opinion that Mr. Clift is wrong when he opines that a person of ordinary skill in the art would understand the term "body" in all of the asserted claims to mean "a mass" instead of "the main physical structure of the mattress, not any layer(s) thereof."

10. Mr. Clift is wrong because the entirety of the intrinsic record—including the claims, specification, and prosecution history—makes clear that the term "body" refers not to any "mass" of foam but to the main physical structure of the mattress. I note that Mr. Clift stated that "[t]he term 'body' does not have a specialized meaning in the mattress industry." Clift Decl. ¶ 31; *see also* Clift Dep. Tr. at 99:14–23, 100:20–101:5 (testifying that the term "body" is not one that he has heard used in the industry). I agree that the term "body" has no specialized meaning in this field.

11. I have reviewed the text of all of the claims in the Asserted Patents that use the term "body," both asserted and unasserted. In my opinion, Mr. Clift draws the wrong conclusion from the claim language, because the claims themselves lead a person of ordinary skill in the art to conclude that "body" refers not to any "mass," but rather to the main physical structure of the mattress. The "body" in the claims is the body *of a mattress*—not just a body in the abstract. Indeed, claims 1 and 9 of the '173 patent recite "body of the mattress." Similarly, the asserted method claims (claim 8 of the '763 patent, claim 5 of the '173 patent, and claim 10 of the '935 patent) recite that the "body" is "shaped and sized *for use as a mattress*." It follows that the "body" is the main physical structure of a mattress. Furthermore, claim 8 of the '763 patent and

claim 10 of the '935 patent recite "providing a plurality of rectangular foam *pieces* to form a body of foam"—not "providing a plurality of rectangular foam *bodies* to form a body of foam." The fact that the claims require assembling multiple pieces of foam together to form the body supports the construction that the body is the main physical structure of the mattress, not any mass of foam.

12. Contrary to Mr. Clift's declaration, the specification confirms that "body" refers to the main physical structure of the mattress, not just some layer or mass of foam in of the mattress. In the Asserted Patents, "body" is always used to refer to the main physical structure of the mattress. For example, in the figures and specification, the "mattress" is labeled as "12" and the "body" as "10." *See, e.g.*, '763 patent at 2:6–8 ("FIG. 1 is a top perspective of a mattress. In FIG. 1, there is illustrated a mattress 10 including a body 12 formed of foam and at least one insert 20 located within the body 12."). As seen in Figure 1 below, the body (12) plus four inserts (20) make up the entirety of the mattress (10):



Fig. 1

*Id.* at Fig. 1; *see also id.* at 2:11–18 (describing the shape of the mattress (10) by describing the structure of the body (12)). The Asserted Patents also use the term "mattress body" several times, further confirming that "body" refers to the *body of the mattress—i.e.*, the main physical

structure of the mattress—and not just some "mass" of material in a mattress. *See, e.g.*, *id.* at Abstract, 1:33–35, 2:65–67.

13.    There are no embodiments in any of the Asserted Patents in which the "body" is anything less than the main physical structure of the mattress. The Asserted Patents describe an embodiment in which the body is made of multiple layers. But the patents draw a clear distinction between a mattress "body" and the "layers" that may make up the body: the patents *never* refer to multiple layers as "bodies" or to a single layer of a multi-layer mattress as a "body." In particular, the specification explains:

> While the embodiment in FIG. 1 has a body 12 of homogenous construction, the body 12 could be formed of a combination of various types of foam with different mechanical characteristics. For example, ***the body 12 could be composed of multiple layers*** of such material, varying in respective mechanical characteristics, progressing in layer upon layer from the top surface 14 to the bottom surface 15. In addition to such top-to-bottom layering (or in substitution therefor), ***the body 12 could be composed of multiple layers*** of such material, varying in respective mechanical characteristics, progressing in layer upon layer between both end surfaces 18, and/or between both side surfaces 16.

'763 patent at 2:26–38 (emphases added). In other words, the mattress "body" can either (1) be of homogenous construction, or (2) be "composed of multiple layers." In the latter situation, "body" refers to all of the layers collectively, not any single layer. It follows that a single layer of a multi-layer mattress is not itself the "body."

14.    Mr. Clift, citing the excerpt from the specification above, asserts that "[t]he specification uses 'body' broadly to refer in some instances to a single layer of a mattress, or in others to a combination of layers." Clift Decl. ¶ 34. But Mr. Clift misunderstands the specification. When Mr. Clift says the specification uses "body" to refer to "a single layer of a mattress," he appears to be referring to the part of the specification that refers to the main physical structure of a homogenous foam mattress as the "body." That homogenous foam is not a single layer of a multi-layer mattress, but rather is a simpler mattress construction in which the

main physical structure is homogenous foam.  Thus it is clear that the "body" in that embodiment is still the main physical structure of the mattress.[1]

15.    Mr. Clift is also wrong because he misreads the prosecution history.  First, throughout the prosecutions of the Asserted Patents, the applicant consistently referred to the "body" in the claims as "the body of the mattress," and *never* described the claimed mattress as having multiple "bodies" or said that anything less than the main physical structure of the mattress was the "body."  For example, during prosecution of the '763 patent, claim 8 as filed recited the "mattress of claim 1 further comprising . . . an insert that reinforces *the body of the mattress*."  '763 File History, 5/1/2006 Application at 11.  Dreamwell canceled claim 8, but amended claim 1 to its current form and explained that it had "amended base Claim 1 to substantially include the limitations of now canceled Claim 8."  '763 File History, 8/6/2007 Amendment at 4; *id.* at 7.  Dreamwell then proceeded to refer explicitly to the "body" in issued claim 1 as "the body of the mattress," even though that phrase no longer appeared in the claim. *See id.* at 8 ("Luck discloses a mattress with a removable insert that preferably provides support to a portion of a person's body . . . but not for 'reinforcing *the body' of the mattress*.") (emphasis added).  Dreamwell thus took the position during prosecution of the '763 patent that "body" referred to the "body of the mattress."

16.    More importantly, during prosecution of the '763 patent, the applicant disclaimed any interpretation of the patents in which the body is less than the main physical structure of the mattress.  In particular, to overcome the prior art and to gain issuance of the '763 patent, the applicant represented that the "body" is not a layer of a multi-layer structure but, rather, the overall mattress structure.

---

[1] I note that at his deposition on his prior declaration, Mr. Clift was unable to identify any place in the specification where the term "body" is used to describe a single layer of a multi-layer mattress. *See* Clift Dep. Tr. at 104:1–105:1.

17.    During prosecution of the '763 patent, on August 7, 2006, the examiner rejected pending claim 1 as anticipated by U.S. Patent No. 6,061,856 to Hoffmann ("Hoffmann").  As seen below in Figures 1 and 2 of Hoffmann, and as explained by the examiner, "Hoffmann discloses a mattress comprising a channel extending into the body 11 perpendicularly therefrom, the side surface 16a being read as the channel surface.  Hoffmann also discloses a plurality of channels 12 including inserts 13 affixed therein."  '763 File History, 8/7/2006 Office Action at 4.



18.    In response to the rejection, the applicant amended pending claim 1 as seen below:

1.    (Currently amended) A mattress comprising:
       [[A]] a body made of foam having a mechanical characteristic, the body having a top surface, a bottom surface, a first and second side surfaces and a first and second end surfaces, at least one of the top and bottom surfaces being a channel surface that includes including a plurality of channels channel extending into the body perpendicularly therefrom; and
       an insert, having a mechanical characteristic different from the mechanical characteristic of the foam and affixed within the channel, the insert reinforcing the body[[,]].
       wherein each channel has affixed therein an insert that reinforced the body

'763 File History, 11/7/2006 Amendment at 2.

19.    The applicant distinguished Hoffmann by arguing that having a channel on either the top or bottom surface of the mattress differs from having a channel disposed on the interior of the mattress, as seen in Hoffmann:

       Hoffmann is directed to a mattress having a base member provided with cylindrical cavities whereupon cylindrical inserts are adapted to be placed into the cavities.  These cavities or bores are centrally disposed within the base member

7

and "extend through the interior" of the base member sometimes from the sides, *but not on the top or bottom surface of the mattress*. *(See Col. 3, Lines 21-22).* Figure 2 of Hoffmann shows a divided base that again *does not include a channel extending from its top or bottom surface*. In particular, the base member in Figure 2 is divided 'to facilitate placement of inserts' within the centrally disposed cavities. The Examiner admits that 'Hoffmann discloses channels extending from the side surface' and identifies the side surfaces of the base member as 'side surface 16a' illustrated in Figure 1. In contrast, amended base claim 1 includes "at least one of top and bottom surface including a channel extending into the body perpendicularly therefrom." The channels extend perpendicularly from at least one of the top and bottom surface and the inserts are affixed within these top and/or bottom surface channels to reinforce the body. Thus, Hoffmann does not teach or suggest all the elements of amended base claims 1 and, therefore, the §102 Rejection of base claim 1 should be withdrawn.

'763 File History, 11/7/2006 Amendment at 6-7 (emphases added).

20.     By distinguishing Hoffmann on the basis that its channels were "centrally disposed" on the interior of the "divided base," and were "not on the top or bottom surface of the mattress," the applicant represented that the claims require channels on the top or bottom surface of whatever constitutes the main physical structure of the mattress—in Hoffmann's case, the two layers of the "divided base." This means that the claimed "body" is *not* any one layer of a multilayer mattress, but rather all the layers that compose the main structure of the mattress. Therefore Mr. Clift's interpretation of the prosecution history is wrong.

21.     Indeed, if "body" were merely "a mass," then Hoffmann would disclose the limitation that the applicant told the Patent Office was missing. In particular, each layer of the Hoffmann mattress (21a and 21b in Figure 2 above) is "a mass" and has a top and bottom surface, "at least one of the top and bottom surface[s] including a channel extending into the [mass] perpendicularly therefrom." The applicants argument to the Patent Office that "Hoffmann shows a divided base that again does not include a channel extending from its top or bottom surface" would be completely irrelevant—and totally insufficient to overcome the examiner's rejection—if "body" were defined as "a mass."

22.     Mr. Clift dismisses this prosecution history by arguing that the applicant's statements to the Patent Office were simply "discussing the Hoffmann reference," not the claimed invention.  *See* Clift Decl. ¶ 81.  But, for the reasons explained above, a person of ordinary skill in the art would understand the applicant's statements to the Patent Office to be inconsistent with Plaintiffs' current proposed construction of "body."  Indeed, the only way the applicant was able to overcome the rejection based on Hoffmann was by treating the "body" as the main physical structure of a mattress.

23.     Mr. Clift also relies heavily on a dictionary definition of "body" to support his opinion, but in doing so he misrepresents what the dictionary says.  Mr. Clift states that "[a]s defined by Merriam-Webster, 'body' is 'a mass or portion of matter, especially distinct in its totality from other masses.'"  Clift Decl. ¶ 32.  But the definition Mr. Clift cites is the fourth definition listed among *many* definitions of the term "body."  In fact, most of the definitions that Mr. Clift skips over before getting to his cherry-picked definition actually support Casper's proposed construction of "body" as the main physical structure of the mattress:

- "the ***total organized physical substance*** of an animal or plant: ***the aggregate*** of tissues . . ."

- "***the main, central, or principal part of something***"

- "***the main part*** of a document, speech, or literary composition as distinguished from the title, preamble, preface, conclusion, or appendixes"

- "***the main part*** of a social or business letter as distinguished from the heading, salutation, and close"

- "***the dominant part*** of a fortification"

- "***the main or the larger part*** of a tool . . ."

- "***the main matter*** of a table exclusive of the headings"

- "***the largest part*** of a container . . ."

*See* D.I. 51-8 at 6.  The definition Mr. Clift cites from the online dictionary (http://wordnet-online.freedicts.com/definition?word=body) is similarly the *fifth* definition listed, and Mr. Clift

ignores the first definition, which supports Casper's proposed construction: "***the entire physical structure of an organism***." Given these definitions, Mr. Clift was wrong to conclude that Plaintiffs' proposed construction is the plain and ordinary meaning of the term. On the contrary, Casper's proposed construction is most consistent with the dictionary definitions of "body."

24. Mr. Clift's reliance on the use of the term "body" in Murphy is also incorrect. I understand that the question here is what the term "body" means in the context of *these* Asserted Patents. As explained above, the Asserted Patents universally and consistently use the term "body" to refer to main physical structure of a mattress.

25. Finally, contrary to Mr. Clift's arguments (Clift Decl. ¶¶ 39–40), the embodiment in Figure 8 of the '935 patent is not inconsistent with Casper's proposed construction and, in fact, supports the understanding that the "body" is the main physical structure of the mattress, not just a layer. Figure 8 shows an embodiment in which a "customary cloth-type mattress cover" (42) or "a layer of additional material" (44) are used to hold the inserts in place. '935 patent at 3:50–65, Fig. 8. The '935 patent never refers to these materials as "bodies," but rather distinguishes between them and the "body 12"—*i.e.*, the main physical structure of the mattress. Indeed, in Mr. Clift's annotation of Figure 8 (*see* Clift Decl. at 19), he labels the main physical structure of the mattress the "body." In other words, the "body" in Figure 8 is the main physical structure of the mattress, just as Casper proposes for its claim construction.

26. I also note that Figure 8 does not appear to be drawn to scale. Element 42 in Figure 8 is a "customary cloth-type mattress cover." It is understood in the industry that a "customary cloth-type mattress cover" generally refers to a thin sheet of fabric (typically not thicker than a couple of millimeters), or a pair of thin sheets of fabric quilted together about a filling material (e.g., polyester batting), that is not structurally integrated with the main physical structure of the mattress.

27.     For these reasons, it is my opinion that Mr. Clift is wrong to opine that a person of ordinary skill in the art would understand the term "body" in all of the asserted claims to mean "a mass," and instead a person of ordinary skill would understand that term to mean "the main physical structure of the mattress, not any layer(s) thereof."

**B.      "at least one of the top and bottom surfaces including a plurality of channels" ['763, cl. 1]**

| SSB Proposed Construction/Position: | Casper Proposed Construction/Position: |
| --- | --- |
| No construction necessary<br><br>In the alternative, "the top and/or bottom surface(s) including a plurality of channels" | "the top and/or bottom surfaces of the mattress (not an interior surface) include(s) a plurality of channels" |

28.     It is my further opinion that Mr. Clift is wrong in his opinion about the phrase "at least one of the top and bottom surfaces including a plurality of channels" in claim 1 of the '763 patent.  Specifically, he is wrong to reject Casper's proposed construction, because a person of ordinary skill in the art would understand this claim phrase to mean "the top and/or bottom surfaces of the mattress (not an interior surface) include(s) a plurality of channels."

29.     Claim 1 of the '763 patent requires "a body made of foam [with] at least one of the top and bottom surfaces including a plurality of channels extending into the body."   As discussed above, because the mattress "body" is the main physical structure of the mattress, the top and bottom surfaces of the main physical structure of the mattress must have a plurality of channels—not some internal layer or interior portion of the mattress.

30.     The specification is consistent in its depiction of channels being on the surface of the mattress.  For example, as seen below in Figure 1 ("a top perspective *of a mattress*") and Figure 2 ("a cross-sectional view *of the mattress of FIG. 1*"), the channels are on the top surface *of the mattress*:



Fig. 1

Fig. 2

'763 patent at Figs. 1 & 2, 2:6, 3:1 (annotations added). Even if the embodiment in Figure 1 were made up of multiple layers, the channels would still be on the surface of the mattress—not any individual layer. The specification further explains that the "location of the channel(s) may be selected by identifying regions *within a surface of the mattress* where additional support is desired," and teaches that the inserts should be "suitable for adding support *to a surface of the mattress 10*." *Id.* at 5:1–3, 3:24 (emphases added). Contrary to Mr. Clift's arguments, there is *no* disclosure in any of the Asserted Patents of a mattress with channels on an interior layer or surface.

31.     Mr. Clift notes that dependent claim 4 "requires an additional material that is part of the mattress that covers the channels," and then opines that "[b]ecause the additional material would cover the surface of the body containing the channels and inserts, in such a mattress the channels would necessarily be in the 'interior' of the mattress." Clift Decl. ¶ 74. But Mr. Clift is incorrect. When this embodiment is described in the specification, it states that a customary cloth-type mattress cover placed *over the mattress 10* during manufacture." '763 patent at 4:17–19 (emphasis added). In other words, having a cover surrounding the mattress does not change that the surface of the mattress (which is under the cover) has a plurality of channels.

32.     Mr. Clift is also incorrect to say that Casper's construction is inconsistent with Figure 8 of the '935 patent. For one, Figure 8 is only in the '935 patent and is not part of the

'763 patent in which this term appears. Moreover, the specification explains that what is actually depicted in Figure 8 is merely "a customary cloth-type mattress cover" (42) and "additional material" (44) which can hold the inserts on the surface of the mattress in place. '935 patent at 3:53–57. Thus, Figure 8 is consistent with the rest of the patent disclosure, which teaches that the surface of the body is the surface of the mattress, and that the channels are on the surface of the mattress body—even where additional materials are used to cover the mattress.

33. Even if Mr. Clift is correct that Casper's construction excludes the embodiment in Figure 8, I understand that where a patentee makes a disclaimer during prosecution, a court can exclude embodiments that would otherwise fall within the claims. As explained above in connection with the term "body," during prosecution of the '763 patent, the applicant disclaimed coverage of mattress that do not contain channels on the top or bottom surface *of the mattress*. That is, in prosecuting the '763 patent, the applicant told the Patent Office that Hoffmann did *not* disclose "at least one of the top and bottom surface[s] including a channel extending into the body perpendicularly therefrom," because the channels in the Hoffmann mattress were "centrally disposed within" the mattress and "not on the top or bottom surface of the mattress." '763 File History, 11/13/06 Amendment at 6–7. As seen below, Hoffmann *did* disclose channels on the top and bottom surfaces of *layers* of the mattress—parts 21a and 21b of the "divided base."



FIG.2

The fact that the layers of the Hoffmann mattress had channels on their top or bottom surfaces was not enough: as the applicant argued, the channels had to be on the surface of the mattress as a whole. *Id.* The applicant therefore disclaimed any interpretation of the claims in which the channels are on an internal surface of the mattress.

34. For these reasons, Mr. Clift is incorrect in his opinion regarding the phrase "at least one of the top and bottom surfaces including a plurality of channels" in claim 1 of the '763 patent. Contrary to his opinion, a person of ordinary skill in the art would understand this phrase to mean "the top and/or bottom surfaces of the mattress (not an interior surface) include(s) a plurality of channels."

**C. Whether Dreamwell disclaimed channels that are centrally disposed in the interior of the mattress, and not on the top or bottom surface of the mattress**

| SSB Proposed Construction/Position: | Casper Proposed Construction/Position: |
|---|---|
| No | Yes |

35. It is my further opinion that Mr. Clift is wrong about whether there was a disclaimer of channels that are centrally disposed in the interior of the mattress, and not on the top or bottom surface of the mattress. Contrary to Mr. Clift's opinion, a person of ordinary skill in the art would understand that, during prosecution of the '763 patent, Dreamwell did indeed disclaim channels that are centrally disposed in the interior of the mattress, and not on the top or bottom surface of the mattress.

36. As explained above in connection with the term "body," the applicant disclaimed any interpretation of the patents in which the channels are disposed in the interior of the mattress. The applicant represented, in order to art and to gain issuance of the '763 patent, that the claimed channels must be on the top or bottom surface of the mattress, not on an internal layer of a multi-layer structure.

37.     Mr. Clift opines that the applicant's arguments during prosecution "do not amount to a clear and unambiguous disclaimer of claim scope to a POSITA.  Rather, a POSITA would have understood that the Applicant's statements regarding 'the top or bottom surface of the mattress' was a characterization of the Hoffmann reference—not the Applicant's invention." Clift Decl. ¶¶ 80–81.  I disagree.

38.     Hoffmann discloses channels on the top and bottom surfaces of the *layers* of the mattress, but internal to the mattress as a whole.  Unless the claims are interpreted so as to not cover channels that are centrally disposed in the interior of the mattress, Hoffmann would disclose the limitation "at least one of the top and bottom surfaces including a plurality of channels extending into the body."  But the applicant argued that Hoffmann did not teach this limitation.  Thus, it is clear and unambiguous to a person of ordinary skill in the art that Dreamwell disclaimed channels that are centrally disposed in the interior of the mattress, and not on the top or bottom surface of the mattress.

**D.     "channel" ['763, cls. 1, 4, 7, 8, 9, 10 & 12; '173, cls. 5 & 6; '935, cls. 10 & 13]**

| SSB Proposed Construction/Position: | Casper Proposed Construction/Position: |
|---|---|
| "a long, narrow cut or depression" | No construction necessary<br><br>In the alternative, "a depression or recess" |

39.     It is my opinion that Mr. Clift is wrong to opine that a person of ordinary skill in the art would understand the term "channel" in all of the asserted claims to mean to "a long, narrow cut or depression."  Instead, a person of ordinary skill would understand this term to mean "a depression or recess" because that is the ordinary meaning of "channel" in this context.

40.     The principal dispute here is whether a "channel" is limited to "long" and "narrow" depressions.  As demonstrated by the intrinsic record, it is not so limited.

41.     Neither the claims nor the specification contains any restriction on the size of the channel.   On the contrary, the specification of the Asserted Patents explains that "[t]he channel 19 . . . could be of *any* physical shape . . . although the embodiment in FIG. 1 shows a *linear* shape . . . ." '763 patent at 2:58–60.   Although one such option for a channel is a "long, narrow" channel, it is not the only type of channel encompassed within the claims.

42.     Mr. Clift's opinion that a channel must be "long" and "narrow" would improperly exclude one of the preferred embodiments in the specification.   The Asserted Patents describe an embodiment in which "the channel 19 [is] sized accordingly" to receive "[m]ore than one row of connected pocket springs . . . such as two or three adjacent rows." '763 patent at 3:25–29.   An example of these pocket springs can be seen in Figure 7 of the '935 patent, which shows a single row of pocket springs containing seven springs.   If there were three adjacent rows of pocket springs, as taught in the specification, the channel 19 in this embodiment would be almost half as wide as it is long.   Mr. Clift's opinion would seemingly exclude this specific embodiment disclosed in the specification.



Fig. 7

43.     Mr. Clift's opinion also frustrates the very purpose of the invention.   The stated purpose of the Asserted Patents is "to control variations in firmness at particular regions within a mattress, in order to accommodate different body types, as well as the subjective preference of users." '763 patent at 1:27–29.   To do this, the Asserted Patents teach "inserting reinforcements of various types into channels cut or otherwise formed within the foam." *Id.* at 1:33–35.   In

other words, the whole idea of the patents is to pick and choose the size and location of inserts given the size and preferences of the user. A person of ordinary skill in the art would understand that different body types, in particular, different body heights of users, would require varying widths of channels corresponding to the varying regions of a particular user's body dimensions. For instance, a particularly tall user would require wider lumbar support inserts which would require channels that are wider than allowed by Mr. Clift's opinion. Moreover, the patents recognize that the channels may extend from head to foot and also from side to side, alternately or simultaneously providing "for areas of different . . . support characteristics along the body" and for "multiple comfort zones, such as for multiple users of the mattress." *Id.* at 2:47-58. Dividing the channels laterally across the bed to provide different support for different users could result in channels that are not long and narrow. Mr. Clift's opinion would exclude these and other configurations, thus defeating the flexible purposes of the invention.[2]

44. Mr. Clift's opinion is also inconsistent with arguments Dreamwell made during prosecution. In particular, during prosecution of the '763 patent, in attempting to distinguish a prior art patent, U.S. Patent No. 5,231,717 ("Scott"), Dreamwell agreed that "Scott discloses a bedding system . . . having depressions *(i.e., channels)* formed therein." '763 File History, 8/6/07 Remarks at 8 (emphasis added). As seen below in Figure 1 from Scott, the depressions in Scott that Dreamwell admitted were "channels" are not long and narrow. Mr. Clift's opinion would contradict Dreamwell's admissions during prosecution that sections 38 and 44 of Scott are "channels."

---

[2] To the extent "there must be some limit to the size of the channel so that it provides the desired support where needed, as opposed to the mattress taking the homogenous form of the prior art that the inventor sought to overcome" (*see* Clift Decl. ¶ 53), a person of ordinary skill in the art would recognize that limit without Mr. Clift's overly restrictive construction.



45.     Mr. Clift relies on two levels of dictionary definitions in support of his opinion.  I understand that extrinsic evidence, such as dictionary definitions, are less relevant than the intrinsic record in interpreting a claim term.  I also understand that it is improper to use extrinsic evidence, such as dictionary definitions, to contradict the intrinsic record.  As explained above, the intrinsic record shows that a "channel" is *not* limited to "a long, narrow cut or depression." Mr. Clift's cherry-picked definition of "channel" contradicts the intrinsic evidence, and therefore a person of skill in the art reading the intrinsic evidence would not agree with Mr. Clift's opinion.

46.     For these reasons, it is my opinion that the term "channel" is not limited to "a long, narrow cut or depression."  If the Court chooses to construe the term, it should construe the term to mean "a depression or recess."

E.     **"within" ['763, cls. 1 & 4; '173, cl. 5]**

| SSB Proposed Construction/Position: | Casper Proposed Construction/Position: |
|---|---|
| "entirely inside of" | No construction necessary<br><br>In the alternative, "inside or in" |

47.     It is my opinion that Mr. Clift is wrong to conclude that a person of ordinary skill in the art would understand the term "inside" in claims 1 and 4 of the '763 patent and claim 5 of

the '173 patent to mean "*entirely* inside of," and that instead a person of skill would understand this term to mean "inside or in" consistent with the term's ordinary meaning.

48.    Contrary to Mr. Clift's opinion, the ordinary meaning of the term "within" in this context does not require being "*entirely* inside of."  Mr. Clift offers no reasons why the adverb "entirely" should be added to the construction of a term that is readily understood by a person of ordinary skill in the art.

49.    Mr. Clift principally relies on his assertion that all of the figures in the Asserted Patents show inserts entirely inside the channel, so therefore the term "within" must be construed to require being *entirely* inside of.  *See* Clift Decl. ¶¶ 62–65.  But this is inconsistent with the summary of the law the Mr. Clift provides in his own declaration:  "[I]n most cases, preferred embodiments and examples appearing in the specification should not be read into the claims." *Id.* ¶ 20.  Mr. Clift does not explain why, here, the characteristics of the patent drawings should be read into the claims.

50.    For these reasons, the term "within" is not limited to "entirely inside of."  If the Court chooses to construe the term, it should construe the term to mean "inside or in."

## F.    "does not entirely fill the channel" ['935, cl. 10]

| SSB Proposed Construction/Position: | Casper Proposed Construction/Position: |
|---|---|
| No construction necessary<br><br>In the alternative, "leaves a portion of the channel unfilled" | "does not fill the channel to the surface" |

51.    It is my opinion that Mr. Clift is wrong to opine that a person of ordinary skill in the art would understand the phrase "does not entirely fill the channel" in claim 10 of the '935 patent to mean "leaves a portion of the channel unfilled."  Instead, a person of skill would understand this phrase to mean "does not fill the channel to the surface."

52.     Claim 10 of the '935 patent requires "affixing at least one insert having planar top and bottom surfaces into the channel, . . . wherein the insert does not entirely fill the channel." Based on my review of the specification and prosecution history of the '935 patent, a person of ordinary skill in the art would understand that this limitation refers to whether the insert fills the depth of the channel, not whether it extends all the way to the lateral ends of the channel.

53.     The support for this limitation comes from Fig. 2 of the '935 patent (below) and the accompanying text.  The '935 patent states:

> An insert 20 is located within the channel 19. The insert 20 is of a size substantially equal to the channel 19. The insert 20 may be substantially flush with the channel surface (in FIG. 2, the top surface 14) or ***it may not entirely fill the channel*** 19.

'935 patent at 3:21–24 (emphasis added).   Thus, with respect to filling the channel, the specification describes two alternatives:   (1) the top of the insert is flush with the channel surface, or (2) as seen in Fig. 2, the top of the insert is *not* flush with the channel surface.  It is this second configuration that the specification describes as "not entirely fill[ing] the channel." Notably, the specification does not ever discuss whether the inserts in Fig. 2 (or in any other figure or embodiment) extend all the way to the lateral ends of the channel.  Thus, based on the specification alone, a person of ordinary skill in the art would understand the claim language "insert does not entirely fill the channel" to refer to whether the insert fills the channel to the channel surface.



Fig. 2

54.     Mr. Clift also cites Figure 7 of the '935 patent, showing a row of springs that are flush with the surface of the body, as an alleged example of one way that the insert may not fill

the channel. *See* Clift Decl. ¶¶ 88–89. But the specification *never* says that Figure 7 is an example of this claim limitation, or has anything at all to do with this claim limitation. Figure 7, rather, demonstrates one of the different types of non-foam inserts that can be used as part of the invention ("a string of connected pocket springs")—not whether the insert fills or does not fill the channel. '935 patent at 3:27–32. Figure 7 is therefore not relevant to this construction. Thus, a person of ordinary skill in the art would understand from the specification alone that this term refers to whether the channel is filled to the surface.

55.     The applicant for the '935 patent confirmed this interpretation during prosecution. As filed, the '935 patent did not include the limitation that "insert does not entirely fill the channel." The examiner rejected pending claim 14 (which issued as asserted claim 10) as being obvious over U.S. Patent No. 4,706,313 to Murphy, in view of U.S. Patent No. 6,256,821 to Boyd. *See* '935 File History, 4/9/2014 Office Action at 2. In response, the applicant amended pending claim 14 to add "wherein the insert does not entirely fill the channel." '935 File History, 7/2/2014 Amendment at 3. The applicant stated that "[s]upport for the amendment to claims 1 and 14 can be found in at least FIG. 2 and the related description in the specification" (which I discussed above). *Id.* at 5. In its remarks, the applicant argued:

> A prima facie case of obviousness has not been established because there is no teaching or suggestion of the claimed mattress and method of manufacturing a mattress. For example, the cited references fail to teach or even suggest the feature wherein the insert having planar top and bottom surfaces does not entirely fill the channel. Murphy admittedly discloses a foam body having essentially rectangular recesses and block bodies disposed therein. However, there is no disclosure or suggestion that the block bodies do not entirely fill the rectangular recess. *In Murphy's FIG. 1, the block bodies are shown completely filling the rectangular recess as evidenced by the coplanar surface of the block body and the foam body.*

*Id.* at 6 (emphasis added). In other words, in distinguishing Murphy from the claimed "insert does not entirely fill the channel," the applicant pointed only to the "the coplanar surface of the block body and the foam body." The applicant ***did not*** discuss whether the insert filled the

channel laterally.  In fact, as seen below in Figure 1, Murphy discloses only a single insert (14) that fills the channel (8) to the surface but *does not* fill the width of the channel.  Unless the phrase "insert does not entirely fill the channel" refers only to filling to the surface of the channel, the insert (14) shown in Figure 1 of Murphy would have anticipated this limitation.



FIG.1

56.     Indeed, Murphy teaches that "[t]he block bodies are, of course, sized so that they closely abut adjacent block bodies and completely fill the recesses, ***except for those areas where block bodies are intentionally left out***."  Murphy at 4:12–16.  In other words, Murphy expressly teaches embodiments in which some of the blocks are left out so as to not entirely fill the channel laterally.  Thus, unless "fill[ing] the channel" refers to depth only, Murphy would teach this limitation.  But the applicant told the Patent Office that "there is no disclosure or suggestion [in Murphy] that the block bodies do not entirely fill the rectangular recess."  Given the clear disclosure of Murphy, this can ***only*** be interpreted to mean that filling the rectangular recess refers to depth.

57.     Mr. Clift is wrong to opine that there was no disclaimer.  Mr. Clift confusingly states that "[a] POSITA reviewing Murphy would readily understand that there was no need for the Applicant to also point out that no spaces are shown between the block bodies in Murphy's Fig. 1."  Clift Decl. ¶ 92.  This statement makes no sense because there is only a single block body shown in Murphy's Figure 1 (above).  That block body (*i.e.*, insert) does not fill the recess

laterally, but was still described in the prosecution history as "completely filling the rectangular recess" due to "the coplanar surface." A person of ordinary skill in the art would understand this to be a clear and unambiguous disavowal of claim scope. Thus, whether an insert fills a channel must refer to whether it fills the depth of the channel.

58.     For these reasons, Mr. Clift's opinion is incorrect, and a person of ordinary skill in the art would instead understand the phrase "does not entirely fill the channel" in claim 10 of the '935 patent to mean "does not fill the channel to the surface."

**G.     Whether Dreamwell disclaimed inserts that fill the channel to the surface**

| SSB Proposed Construction/Position: | Casper Proposed Construction/Position: |
|---|---|
| No | Yes |

59.     It is my opinion that Mr. Clift is wrong to conclude that there was no disclaimer of inserts that fill the channel to the surface. A person of ordinary skill in the art would understand that, during prosecution of the '935 patent, Dreamwell did indeed disclaim inserts that fill the channel to the surface.

60.     As explained above, during prosecution of the '935 patent, the applicant argued that an insert in the prior art Murphy patent that clearly does not fill a channel laterally but fills the channel to the surface nevertheless "completely fill[ed]" the channel. The applicant therefore conclusively disclaimed all inserts that fill a channel to the surface, regardless of whether they also fill the channel laterally.

61.     As filed, the '935 patent did not include the limitation that "insert does not entirely fill the channel." The examiner rejected pending claim 14 (which issued as asserted claim 10) as being obvious over U.S. Patent No. 4,706,313 to Murphy, in view of U.S. Patent No. 6,256,821 to Boyd. *See* '935 File History, 4/9/2014 Office Action at 2. In response, the applicant amended pending claim 14 to add "wherein the insert does not entirely fill the channel." '935 File History, 7/2/2014 Amendment at 3. The applicant stated that "[s]upport for

the amendment to claims 1 and 14 can be found in at least FIG. 2 and the related description in the specification" (which I discussed above). *Id.* at 5. In its remarks, the applicant argued:

> A prima facie case of obviousness has not been established because there is no teaching or suggestion of the claimed mattress and method of manufacturing a mattress. For example, the cited references fail to teach or even suggest the feature wherein the insert having planar top and bottom surfaces does not entirely fill the channel. Murphy admittedly discloses a foam body having essentially rectangular recesses and block bodies disposed therein. However, there is no disclosure or suggestion that the block bodies do not entirely fill the rectangular recess. ***In Murphy's FIG. 1, the block bodies are shown completely filling the rectangular recess as evidenced by the coplanar surface of the block body and the foam body.***

*Id.* at 6 (emphasis added). In other words, in distinguishing Murphy from the claimed "insert does not entirely fill the channel," the applicant pointed only to the "the coplanar surface of the block body and the foam body." The applicant ***did not*** discuss whether the insert filled the channel laterally. In fact, as seen below in Figure 1, Murphy discloses only a single insert (14) that fills the channel (8) to the surface but *does not* fill the width of the channel. Unless the phrase "insert does not entirely fill the channel" refers only to filling to the surface of the channel, the insert (14) shown in Figure 1 of Murphy would have anticipated this limitation.



62. As discussed above with respect to the term "does not fill the channel," Mr. Clift's rebuttals to this clear and unambiguous disclaimer do not make sense.

63.     For these reasons, it is my opinion that Mr. Clift is wrong, and that a person of ordinary skill in the art would understand that Dreamwell disclaimed inserts that fill the channel to the surface.

**H.      "assembling the [plurality of] rectangular foam pieces to form the body having a channel in the region" ['763, cl. 8; '935, cl. 10]**

| SSB Proposed Construction/Position: | Casper Proposed Construction/Position: |
|---|---|
| No construction necessary<br><br>In the alternative, "assembling the [plurality of] rectangular foam pieces to create the body, where the assembled body has a channel in the region" | "assembling the [plurality of] rectangular foam pieces to form the body and to form a channel in the region" |

64.     It is my opinion that Mr. Clift is wrong about the meaning of this claim phrase, and that instead a person of ordinary skill in the art would understand the phrase "assembling the [plurality of] rectangular foam pieces to form the body having a channel in the region" in claim 8 of the '763 patent and claim 10 of the '935 patent to mean "assembling the [plurality of] rectangular foam pieces to form the body and to form a channel in the region."

65.     The parties dispute here is whether the step in claim 8 of the '763 patent and claim 10 of the '935 patent of "assembling the [plurality of] rectangular foam pieces to form the body having a channel in the region" requires forming a channel.  Both the specification and prosecution histories of the Asserted Patents confirm that it does—that is, that the method claims require that the act of assembling rectangular foam pieces forms a channel.

66.     Column 5 of the specification describes three specific and distinct methods of forming channels in the mattress:

> [1] Channels may be formed in the mattress by cutting. . . .  [2] As an alternative to cutting instruments, one or more channels 19 may be formed in the body 12 of a mattress 10 by molding the channels 19 into the foam of the body 12 as the body 12 itself is molded.  ***[3] Additionally, or instead, the body 12 may be formed of a number of rectangular foam sections assembled so that the assembled body 12 includes the channels 19.***

'763 patent at 5:6–43 (emphasis added). In other words, the patents clearly distinguish between different methods of forming channels. Channels can be formed through (1) cutting, (2) molding, or (3) assembly of rectangular foam sections.

67. The method claims require the third method of forming channels—by assembly of rectangular foam sections—not cutting or molding. This is evident, for example, by comparing the language of the claims to the language of the specification describing forming channels by assembly:

| Claim Language | Specification Language |
|---|---|
| "forming the channel comprises assembling a plurality of rectangular foam pieces into a mattress that includes the channel" | "the body 12 may be formed of a number of rectangular foam sections assembled so that the assembled body 12 includes the channels" |

68. Mr. Clift's discussion of the specification on this limitation is not convincing. Mr. Clift, for example, quotes the specification language above and concludes, without explanation, that this supports his opinion. *See* Clift Decl. ¶ 100. It does not. Given the context of the discussion (*i.e.*, methods of forming a channel), as well as the explicit statement that "assembly" is an "alternative to cutting," it is clear that the "assembly" language refers to a method of forming channels.

69. The presence of dependent claims 9 and 10 in the '763 patent does not change this conclusion. *See* Clift Decl. ¶¶ 98–99. These claims mean that in addition to forming channels by assembling rectangular blocks, the method can also include cutting or molding. But these claims do not erase the requirement of the independent claim that at least one channel be formed by the act of assembling rectangular foam pieces.

70. The prosecution histories of all three Asserted Patents confirm that the claims require assembling pieces of foam to form channels. First, in prosecution of the '763 patent, as originally submitted claim 9 (which issued as asserted claim 8) included the step of "forming a

channel into the body within the region." The claim did not specify any method of forming a channel. Instead, three dependent claims (10–12) were directed to the three methods of forming a channel described in the specification (cutting, molding, and assembling):

> 10. The method of claim 9 wherein forming the channel comprises *cutting* foam out of the body.

> 11. The method of claim 9 wherein forming the channel comprises *molding* the channel into the foam.

> 12. The method of claim 9 wherein forming the channel comprises *assembling* a plurality of rectangular foam pieces into a mattress that includes the channel."

71. The examiner rejected claim 9 (the base claim), as well as claims 10–11 (the cutting and molding claims), based on U.S. Patent No. 4,768,253 to Boyd ("Boyd"). The examiner explained: "The method of forming the channels whether by cutting or molding is an obvious matter of design choice." The examiner did not issue a prior art rejection of claim 12 (the "assembly" dependent claim). '763 File History, 8/7/2006 Office Action at 4.

72. In response to the rejection, the applicant replaced the language "forming a channel into the body within the region" in independent claim 9 with "assembling the plurality of rectangular foam pieces to form the body having a channel in the region." '763 File History, 11/7/2006 Amendment at 3. Dreamwell stated that it was "amend[ing] base claim 9 to *include the limitation of former dependent claim 12* and more clearly recite 'assembling the plurality of rectangular foam pieces to form the body having a channel in the region.'" *Id.* at 7 (emphasis added). As explained above, dependent claim 12 explicitly stated that "assembling" rectangular foam pieces was to "form[] the channel." Thus, a person of ordinary skill in the art would understand the "assembling" language in claim 8 to refer to a method of forming a channel.

73. Dreamwell further argued to the Patent Office that "Boyd does not teach or suggest this step and, therefore, does not include all the elements of amended base claim 9."

Boyd discloses assembling multiple foam pieces together (though not to form channels). As seen below, for example, foam body 32 is assembled with cushioning member 42:



Fig. 3

Dreamwell could not have argued that Boyd did not teach this step *unless* the step required assembling rectangular foam pieces *to form a channel*.

74. Dreamwell made similar arguments during the prosecution of the '173 patent. As originally drafted, the claims of the '173 patent did not include the limitation "forming the channel comprises assembling a plurality of rectangular foam pieces into a mattress that includes the channel." The examiner rejected the pending claims based on Boyd. The examiner explained: "Boyd et al discloses a foam support 32 including a channel 34 for receipt of an insert 36 including springs. *The method of forming the channels whether by cutting or molding is an obvious matter of design choice.*" '173 File History, 5/9/2004 Office Action at 2 (emphasis added).

75. In response, the applicant amended the claim to include the limitation "wherein forming the channel comprises assembling a plurality of rectangular foam pieces into a mattress that includes the channel"—*i.e.*, the method of manufacture that the examiner did not say was an obvious matter of design choice. '173 File History, 7/11/2004 Amendment at 2–3. The applicant explained that it amended to focus the claims on a method of manufacture that was not taught in Boyd (the one the examiner had not found was a matter of obvious design choice):

> In independent claim 9, as amended, the Applicant claims a method of forming the channel comprising assembling a plurality of rectangular foam pieces into a

mattress that includes the channel.  ***Nowhere does Boyd suggest a method of forming a channel that includes assembling a plurality of rectangular foam pieces.***

***To the contrary, Boyd teaches away from using a plurality of foam pieces to assemble a mattress including a channel.***  Boyd discloses a mattress comprising "a <u>substantially continous [sic, continuous] foam body</u> including a substantially central opening" (see claim 1 at col. 6, ll. 54-58 (emphasis added).  Boyd further teaches that the interfaces between separate pieces of a mattress – such as foam body 32 and spring assembly 36 – tend to "pull apart and separate when loaded with a sleeping person," and that this is an undesirable effect to be overcome (for example, by securing both to a high tensile strength substrate mesh).  See col. 5, l. 53 to col. 6, l. 7.  Nowhere does Boyd suggest that it is advantageous to form a mattress with even more separate pieces that need to be secured. . . .  In sum, ***Boyd not only fails to provide any teaching or suggestion of assembling a plurality of rectangular foam pieces into a mattress that includes a channel as claimed by the Applicant***, but Boyd also teaches that the use of multiples pieces to form a mattress has disadvantages.

*Id.* at 4–5 (emphases added).

76.     The prosecution history of the '935 patent further confirms that the claims require assembling pieces of foam—not cutting or molding—to form channels.  The claims of the '935 patent as originally drafted required "assembling the rectangular foam pieces to form the body having a channel in the region" (similar to claim 5 of the '173 patent).  During prosecution, the examiner rejected the pending claims as anticipated by U.S. Patent No. 4,706,313 to Murphy ("Murphy").  Murphy discloses channels in a mattress (referred to as "recesses").  Murphy teaches that the channels (numbered 8) are formed by cutting all the way through a top layer of foam (10), after which the top layer of foam (with the channels cut) is assembled together with a bottom layer (12).  *See* Murphy at 3:55–62.  This is depicted in Figure 2 below:



FIG.2

29

77. In response, the applicant told the Patent Office that Murphy's method of manufacturing was not covered by the claims:

> Murphy's method for manufacturing its decubitis ulcer mattress generally includes forming a foam body of two layers. One layer, i.e., **the top layer is cut through an entire thickness thereof to form recesses at selected locations**. The layers are then joined by an adhesive to form a unitary foam body in which the top surface of the bottom layer forms the bottom of each recess. **There is no disclosure or even suggestion of a method including . . . assembling the rectangular foam pieces to form the body having a channel in the region as claimed**.

'935 File History, 1/15/2014 Amendment at 6–7 (emphasis added). The applicant thus took the position that cutting one layer of a mattress to form a channel and then assembling it with another layer does not constitute "assembling the rectangular foam pieces to form the body having a channel in the region."

78. A person of ordinary skill in the art would understand the applicant's arguments during the prosecution, both individually and especially collectively, to establish that the claimed "assembling" must form a channel.

79. For these reasons, Mr. Clift's opinion is incorrect, and a person of ordinary skill in the art would understand the phrase "assembling the [plurality of] rectangular foam pieces to form the body having a channel in the region" in claim 8 of the '763 patent and claim 10 of the '935 patent to mean "assembling the [plurality of] rectangular foam pieces to form the body and to form a channel in the region."

## I. Whether Dreamwell disclaimed forming a channel by cutting into a layer of foam and then assembling the cut layer with another layer of foam

| SSB Proposed Construction/Position: | Casper Proposed Construction/Position: |
| --- | --- |
| No | Yes |

80. It is my opinion that Mr. Clift is wrong to conclude that there was no disclaimer, and that instead a person of ordinary skill in the art would understand that, during prosecution,

Dreamwell did indeed disclaim forming a channel by cutting into a layer of foam and then assembling the cut layer with another layer of foam.

81.     As explained above, during prosecution of the '935 patent, the examiner rejected the pending method claim as unpatentable over Murphy.  As the applicant explained, Murphy teaches a method of manufacturing in which "the top layer is cut through an entire thickness thereof to form recesses at selected locations," and is then joined with a second layer "to form a unitary body in which the top surface of the bottom layer forms the bottom of each recess."  '935 File History, 1/15/14 Amendment at 6–7.



82.     The applicant argued that Murphy's method of manufacture did not constitute "assembling the rectangular foam pieces to form the body having a channel in the region."  By distinguishing Murphy this way, Dreamwell clearly and unmistakably disclaimed forming a channel by cutting into a layer of foam and then assembling the cut layer with another layer of foam.

83.     Mr. Clift does not offer any credible reasons for finding that this is not a disclaimer of claim scope.  He asserts, for example, that this does "not amount to a clear and unambiguous disavowal of claim scope to one of ordinary skill in the art" because the applicant was "merely characterizing the insufficiency of the prior art."  Clift Decl. ¶ 105.  But the applicant was doing more than simply characterizing the insufficiency of the prior art;

Dreamwell, rather, was representing what steps do and do not constitute "assembling the rectangular foam pieces to form the body having a channel in the region." Because the applicant argued that Murphy's method of manufacture did not meet that limitation, Plaintiffs should not be able to now argue that a similar manufacturing method infringes.

84. For these reasons, Mr. Clift's opinion is not correct, and instead a person of ordinary skill in the art would understand that Dreamwell disclaimed forming a channel by cutting into a layer of foam and then assembling the cut layer with another layer of foam.

## J. Order of steps for method claims ['763, cl. 8; '173, cl. 5; '935, cl. 10]

| SSB Proposed Construction/Position: | Casper Proposed Construction/Position: |
|---|---|
| *The methods do not prescribe an order of operations* | *The method steps must be performed in the recited order* |

85. It is my opinion that Mr. Clift is wrong to opine that the method claims do not prescribe an order of operations. Instead, the steps of claim 8 of the '763 patent, claim 5 of the '173 patent, and claim 10 of the '935 patent must be performed in the recited order.

86. I understand that steps of a claim must be practiced in the recited order when the plain language of the claims require it. Here, because each step refers to an element that is introduced in the previous step, a person of ordinary skill in the art would understand that the steps must be performed in that order.

87. Claim 5 of the '173 patent is exemplary and includes the following steps:

[1] providing **a body** of foam shaped and sized for use as a mattress;

[2] locating **a region** of **the body** where increased support is desired;

[3] forming **a channel** into the body within **the region**; and

[4] affixing an insert into **the channel** . . . .

As seen above, the antecedent basis for "*the* channel" in the "affixing" step comes from the language "forming *a* channel" in the prior "forming" step. Thus, the "affixing" of the insert must

occur *after* the "forming" of the channel. The same is true of the other steps (*e.g.*, because the antecedent basis for "*the* region" in the "forming" step comes from the language "locating *a* region" in the "locating" step, the "locating" must occur before "forming").

88. The grammar of claims 8 of the '763 patent and claim 10 of the '935 patent is similar and compels a similar conclusion:

<table>
<tr><td align="center"><u>**'763 patent, claim 8:**</u></td><td align="center"><u>**'935 patent, claim 10:**</u></td></tr>
<tr><td>[1] providing a plurality of rectangular foam pieces to form **a body** of foam . . . ;</td><td>[1] providing a plurality of rectangular foam pieces to form **a body** of foam . . . ;</td></tr>
<tr><td>[2] locating **a region** of **the body** where increased support is desired;</td><td>[2] locating **a region** of **the body** where increased support is desired;</td></tr>
<tr><td>[3] assembling the plurality of rectangular foam pieces to form the body having **a channel** in **the region**; and</td><td>[3] assembling the rectangular foam pieces to form the body having **a channel** in **the region**;</td></tr>
<tr><td>[4] affixing an insert into **the channel** . . . .</td><td>[4] affixing at least one insert having planar top and bottom surfaces into **the channel** . . . .</td></tr>
</table>

Thus, a person of ordinary skill in the art would understand based on the plain language of the claims that the steps must be practiced in order.

89. Logic would also dictate that the steps must be practiced in order. For example, step 4 of all the method claims (*e.g.*, "affixing an insert *into the channel*") refers to the completed results of prior step 3 (*e.g.*, "forming [or having] *a channel*").[3] Thus, step 3 ("forming" or "assembling") must occur before step 4 ("affixing") as a matter of logic. The same is true for steps 1 and 2 ("locating" a region of a body must occur after the body is "provid[ed]") and steps 2 and 3 ("forming a channel into the body *within a region*" must occur after the region is "locat[ed]").

---

[3] I note that Mr. Clift agreed at his deposition that at least the "affixing" step would need to occur after the "forming" step. *See* Clift Dep. Tr. at 160:16–161:5.

90.     Mr. Clift's opinion is wrong and his explanation is not convincing.  Mr. Clift first asserts that the claim steps can be "performed simultaneously" or in "[o]ther orders," such as performing the affixing step prior to the assembling step.  *See* Clift Decl. ¶ 112.  But Mr. Clift does not cite any valid support for these assertions.  For example, Mr. Clift cites a portion of the specification ('763 patent at 5:37–40) that discusses *molding* a mattress body, not *assembling* layers to form a body as required by the asserted manufacturing claims.  I have reviewed the specification and have not found any portion that provides an example in which the steps of "assembling" and "affixing" are performed simultaneously.

91.     Mr. Clift also suggests that the "affixing" step could be performed *prior* to the assembling step.  *See* Clift Decl. ¶ 113.  But this also has no support in the specification or logic.  I have reviewed the specification and have not found any portion that provides an example in which an insert is "affixed" in a channel of a multi-layer mattress before the layers are assembled.  This hypothetical example is also directly contrary to the language of the claims.  The "affixing" step requires affixing into "the channel" that does not exist prior to the "forming" or "assembling" step.  It would not be possible to perform the claim steps as Mr. Clift suggests.

92.     For these reasons, Mr. Clift is wrong to conclude that there is no required order of steps, and instead a person of ordinary skill in the art would understand that the steps of the method claims must be practiced in order.

*       *       *

I declare under penalty of perjury that the foregoing is true and correct.


Executed this 11th day of January, 2018, in King, North Carolina.


_____
Bernhard Kuchel

# APPENDIX A

**Materials Considered**

U.S. Patent No. 7,036,173
U.S. Patent No. 7,424,763
U.S. Patent No. 8,918,935
U.S. Patent No. 7,036,173 File History
U.S. Patent No. 7,424,763 File History
U.S. Patent No. 8,250,689 File History
U.S. Patent No. 8,918,935 File History
U.S. Patent No. 9,549,620 File History
Complaint
Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction
  (and all documents cited and relied upon therein)
Declaration of Matthew D. Clift in Support of Plaintiffs' Motion for Preliminary Injunction
  (and all documents cited and relied upon therein)
Transcript of the deposition of Matthew D. Clift (and accompanying exhibits)
Plaintiffs Serta Simmons Bedding, LLC and Dreamwell, Ltd.'s Opening Claim
  Construction Brief (and all documents cited and relied upon therein)
Second Declaration of Matthew D. Clift in Support of Plaintiffs' Opening Claim
  Construction Brief (and all documents cited and relied upon therein)
U.S. Patent No. 4,706,313 ("Murphy")
U.S. Patent No. 4,768,253 ("Boyd")
U.S. Patent No. 5,231,717 ("Scott")
U.S. Patent No. 6,061,856 ("Hoffmann")
U.S. Patent No. 6,256,821 ("Boyd")